No. 742 October 23, 2024 543

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

LANDWATCH LANE COUNTY,
*Petitioner,*

*v.*

LANE COUNTY
and Kim O'Dea,
*Respondents.*

Land Use Board of Appeals
2024017; A184932

Argued and submitted September 11, 2024.

Sean Malone argued the cause and filed the brief for petitioner.

Gregory S. Hathaway argued the cause for respondent Kim O'Dea. Also on the brief was Hathaway Larson LLP.

No appearance by respondent Lane County.

Before Mooney, Presiding Judge, Lagesen, Chief Judge, and Hellman, Judge.

LAGESEN, C. J.

Affirmed.

**LAGESEN, C. J.**

This case requires us to address a fundamental question about our role as a court. When the legislature writes law and its text makes no sense, are we to give that text the meaning that we think the legislature most likely intended, or are we to declare it ineffectual? Consistent with ORS 174.010 and the unintelligibility canon, we conclude that, under those circumstances, the role of the court is to declare the provision ineffectual. Because that conclusion is consistent with the approach taken by the Land Use Board of Appeals (LUBA) in the final order on review, we affirm.

At the center of this case is a dispute over a piece of real property in Lane County and the Oregon Legislature's 2023 efforts to address that dispute. To make a long story short (before we tell the long version): Years ago, intervenor-respondent obtained legal-lot-of-record verifications for three parcels of land from Lane County. The verifications were based on deeds and property description cards that did not match the corresponding deeds and cards then on file with Lane County's records and tax departments. The verifications provided the foundation for a number of subsequent land-use approvals with respect to those parcels, including property line adjustments and approvals of forest template dwellings. Two of the parcels were sold to new owners. About 10 years after issuing the verifications, Lane County discovered the discrepancies between the documents that intervenor-respondent submitted and the documents that it had on file in its records and tax departments. Lane County then revoked the verifications, but LUBA set aside the revocations on the ground that it was too late to challenge them. We affirmed. *Johnson v. Landwatch Lane County*, 327 Or App 485, 488, 536 P3d 12 (2023).

After LUBA's decision but before ours, Lane County sought the assistance of the legislature, leading to the enactment of House Bill 3362 (2023). In addition to provisions aimed at protecting the purchasers of intervenor-respondent's parcels, the bill contained the provision at issue in this case. That provision opened a new and narrow time window (on or before April 1, 2024) for challenging before LUBA certain land use decisions alleged to be based on

forged documents including, purportedly and as relevant here, a decision approving "a legal lot verification under ORS 92.176." HB 3362(4)(1)(a), (b). ORS 92.176, however, has nothing to do with verifying units of land that were lawfully created. ORS 92.176 provides instead for the validation of units of land that were unlawfully created.

Seeking to have intervenor-respondent's legal lot verifications again set aside, petitioner Landwatch invoked HB 3362(4)(1)(a) to challenge them before LUBA. Landwatch alleged that the verifications were based "on deeds or documents that were forged" and should be invalidated for that reason. LUBA dismissed, reasoning that the provision did not apply because the verification decisions were not decisions under ORS 92.176. Petitioner seeks review of that decision, contending that, notwithstanding the fact that the verification decisions at issue are, undisputedly, not decisions under ORS 92.176, we should nonetheless conclude, based on the legislative history of the statute, that HB 3362(4)(1)(a) authorized its challenge to the legal lot verifications at issue. For the reasons that follow, we conclude that is not permissible for us to do so and, therefore, affirm LUBA's decision.

At issue is whether LUBA erred in determining that HB 3362(4)(1)(a) did not authorize petitioner's challenge to the verification decision at issue. That presents a question of law—one of statutory construction—so we review to determine whether LUBA's order is unlawful in substance. ORS 197.850(9)(a); *Central Oregon LandWatch v. Deschutes County*, 285 Or App 267, 276-77, 396 P3d 968 (2017) (noting that the *PGE/Gaines* analysis applies when LUBA's legal conclusions involve an issue of statutory construction).

Ordinarily, our goal in interpreting statutes is to discern the most likely intent of the legislature. *State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009); ORS 174.020(1)(a). We first examine the text and context of a law. *Gaines*, 346 Or at 171 (citing *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 383 P3d 420 (2016)). We then consider the pertinent legislative history, which we may consult if it "appears useful to the court's analysis." *Gaines*, 346 Or at 172. On that point, *Gaines* counsels that the court determines "the

extent of the court's consideration of that history, [as well as] the evaluative weight that the court gives it[.]" *Id*. "If the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Id*.

As explained below, an examination of the text, context, and legislative history of HB 3362(4)(1)(a) does not yield an interpretation of the phrase "a legal lot verification under ORS 92.176" that its text reasonably can withstand. We thus consult general canons of construction. The most apt, we think, is the unintelligibility canon. That is because the text of HB 3362(4)(1)(a) is so intractably at odds with itself that it is not susceptible to any plausible interpretation. Applying that canon, we conclude that the provision's reference to "a legal lot verification under ORS 92.176" is unintelligible, which as explained further below, means that it is inoperative. Because that conclusion is consistent with LUBA's disposition of the case, we affirm.

We start with the text. *Gaines*, 346 Or at 171. The text of HB 3362(4)(1)(a) provides:

> "[A]ny person may file with [LUBA] a notice of intent to appeal a land use decision made by the county if * * * [t]he challenged decision approved an application for * * * *a legal lot verification under ORS 92.176*."

(Emphasis added.) The emphasized text as written describes an impossibility.

On its face, the provision authorizes a challenge to a "legal lot verification" but only if the verification was made "under ORS 92.176." As noted, that statute does not pertain to legal lot verifications.

The legal lot verification process is not spelled out in the Oregon statutes. Nevertheless, we long have recognized that certain land use proceedings require a local government to determine the legal status of the land involved as an initial step to further land use approvals. *See, e.g.*, *Maxwell v. Lane County*, 179 Or App 409, 411-12, 40 P3d 532 (2002) (explaining that local government must determine legal status of unit of land at issue in connection with

a land use proceeding when determination of legal status is required by state or local legislation). Consistent with that reality, many, if not all, local codes supply a legal lot verification process that is, as it sounds like, a process to *verify* that a unit of land was "lawfully established" as defined by ORS 92.010(3)(a). *Webster's Third New Int'l Dictionary* 2543 (unabridged ed 2002) (defining "verify" as including "to confirm or substantiate in law by oath or proof"). The Lane County Code (LC) defines a "legal lot verification" as "[a] determination or decision made pursuant to LC 13.140 that a unit of land is a lawfully established unit of land." LC 13.030(3)(p); LC 13.140(3) ("A legal lot verification will be approved if the subject property is a lawfully established unit of land as defined by this chapter."); *see also* Deschutes County Code 22.04.040(A) ("[A] lot or parcel shall be verified pursuant to [that code section] to reasonably ensure compliance with the zoning and land division laws *** [to verify] that the lot or parcel was lawfully created[.]"); Coos County Zoning and Land Development Ordinance 6.1.125(1)(a) - (f) (providing property owners with various ways to prove their lot is a "lawfully established unit of land").

A "lawfully established unit of land" is a unit of land created in compliance with applicable planning, zoning, and subdivision or partition ordinances and regulations, or alternatively, if there were no applicable regulatory criteria at the time the land was created, by deed or land sales contract. ORS 92.010(3); *see also* LC 13.030(3)(n)(ii)(aa), (bb); LC 13.140(1)(a)(i) (listing additional criteria for property that is considered "lawfully created"); Coos County Zoning and Land Development Ordinance 6.1.125(1)(a) - (f) (criteria for lawfully created lot). In effect, a legal lot verification is a mechanism for ensuring that a unit of property was lawfully established for development purposes. That is, legal lot verifications provide the basis for subsequent land use decisions and administrative approvals that permit development on land.

By contrast, ORS 92.176—the statute referenced in HB 3362—governs the *validation* of a unit of land. It provides:

> "A county or city may approve an application to validate a unit of land that was created by a sale that did not comply with the applicable criteria for creation of a unit of land if the unit of land *** [i]s not a lawfully established unit of land[,] and [c]ould have complied with the applicable criteria for the creation of a lawfully established unit of land in effect when the unit of land was sold."

ORS 92.176(1). As the terms of the statute expressly state, the validation process is available for land that was *not* "lawfully established." And, as noted, ORS 92.010(3) defines a "lawfully established unit of land" as one that was created pursuant to chapter 92 of the Oregon Revised Statutes, or in compliance with applicable land use ordinances and regulations. The statutory validation process applies only to land units that were created without complying with the land use ordinances and regulations. In that regard, the validation process is different from the verification process, which as noted, applies to units of property that are lawfully established, operating to confirm that lawful establishment.

Thus, verification and validation are distinct processes: a verification is a county's declaration that a unit of land was lawfully established, whereas a validation is a county's ratification of an unlawfully established unit of land as a lawful one going forward, operating as potential recourse to a party with a unit of land that cannot be verified as lawfully established. HB 3362(4)(1)(a) thus articulates an impossibility. The provision proclaims to apply to a "legal lot verification," yet that proclamation is immediately followed by a reference to a statute that does not apply to verifications. Although the effect of verifications and validations is to serve as a predicate for property owners to develop land, they are legally distinct processes that address legally distinct problems (verifying lawfully created units of land on the one hand and validating unlawfully created units of land on the other).

In theory, we could construe HB 3362(4)(1)(a) in one of three ways: to authorize a challenge to a legal lot verification (giving effect to the reference to "verification" but omitting the reference to ORS 92.176), a challenge to the validation of a unit of land (giving effect to the reference to ORS 92.176 but omitting the reference to "verification")

or, perhaps, both (giving effect to the references to "verification" and "ORS 92.176," but inserting the words "or a decision" between "verification" and "under"). After all, the legislature has directed us to adopt constructions that "give effect to all" particulars and provisions. ORS 174.010; *SAIF v. Ward*, 369 Or 384, 404, 506 P3d 386 (2022) ("[W]e seek to give effect to every word, where possible."). On the other hand, the legislature also has explained that "[i]n the construction of a statute, the office of judge is simply to ascertain and declare what is, in terms and substance, contained therein, not to insert what has been omitted, or to omit what has been inserted." And, as demonstrated above, all of the potential readings of the phrase "legal lot verification under ORS 92.176" would require us to step outside of the designated "office."

Given the intractable problems with the text, an examination of the context of subsection 4(1)(a) does not answer the question of how to construe it. We turn to the legislative history for answers. *Gaines*, 346 Or at 172.

That history shows the following. Shortly after LUBA's decision, but before our decision, State Representative Charlie Conrad of Lane County and Representative Boomer Wright of Coos Bay introduced HB 3362 at the request of Lane County. As introduced, the bill was intended specifically to protect the two landowners who purchased two of intervenor-respondent's lots without knowledge of the underlying fraud. Testimony, House Committee on Agriculture, Land Use, Natural Resources, and Water, HB 3362, Mar 30, 2023 (statement of Alex Cuyler, Lane County Intergovernmental Relations Manager) ("HB 3362 *** has been narrowly crafted to fix a unique situation for two families residing in Lane County."); Testimony, House Committee on Agriculture, Land Use, Natural Resources, and Water, HB 3362, Mar 30, 2023 (statement of David Hunnicutt on behalf of Oregon Property Owners Association) (describing the purchasers of the two lots and explaining that the bill "is intentionally drafted solely to benefit innocent purchasers"). The legislative history also indicates that the bill was meant to protect similarly situated landowners who the legislature perceived to be innocent purchasers of land that

was unlawfully established. Staff Measure Summary of the House Committee on Agriculture, Land Use, Natural Resources, and Water, HB 3362 A, Mar 30, 2023 (writing generally that the bill "[a]llows a county to approve an application to validate a unit of land acquired by an innocent purchaser before January 1, 2023 if the county, before the acquisition, approved * * * the unit of land as a lawfully established unit of land * * * and revoked these approvals after the acquisition by the applicant"); Testimony, House Committee on Agriculture, Land Use, Natural Resources, and Water, HB 3362, Mar 30, 2023 (statement of David Hunnicutt on behalf of Oregon Property Owners Association) ("Like other purchasers of property that was illegally divided, [the two purchasers] are innocent purchasers.").

The early versions of the bill protected such purchasers of land by providing them an option to validate their units of land as lawful ones. To do so, the landowners would have to prove that they were "innocent purchasers," meaning that they would have to show that they purchased "property in good faith, with no knowledge that an earlier county decision was based on falsified evidence and no role in that subterfuge." Testimony, House Committee on Agriculture, Land Use, Natural Resources, and Water, HB 3362, Mar 30, 2023 (statement of David Hunnicutt on behalf of Oregon Property Owners Association). If the landowners could prove they were innocent purchasers, then they could apply to the county for a validation of their land pursuant to ORS 92.176. *Id*. Such validation under ORS 92.176 changes the status of an unlawfully established unit of land to a lawfully established one so that that the legal status of the property would not be impacted by an adverse decision on the legal status of intervenor-respondent's property.

During the first public hearing on the bill, Representative Mark Gamba of Milwaukie voiced appreciation for the narrow scope of the bill, but also expressed concern that the bill would "remove the impetus to hold [intervenor-respondent], who did this in the first place, accountable. If she's not sued, which is the only other avenue [the purchasers have], [intervenor-respondent] got away with it. She committed forgery. She sold the parcels.

It's a perfect crime." Tape Recording, House Committee on Agriculture, Land Use, Natural Resources, and Water, HB 3362, Apr 4, 2023, at 00:15:45 (comments of Rep Mark Gamba), https://olis.oregonlegislature.gov (accessed Oct 15, 2024). Senator Floyd Prozanski of Eugene/Springfield and Senator Jeff Golden of Ashland also expressed their desire for the legislature to ensure that the bill did not benefit intervenor-respondent in any way, and Senator Prozanski called for the revocation of her bar license. Tape Recording, Senate Committee on Natural Resources, HB 3362, May 3, 2023, at 00:55:20 (comments of Sen Floyd Prozanski), and at 00:56:24 (question and comment by Sen Jeff Golden), https://olis.oregonlegislature.gov (accessed Oct 15, 2024).[1]

Landwatch Lane County, petitioner in the instant case, opposed the introduced version of the bill because in its view, the unknowing purchasers of unlawfully established land have recourse through another statute, ORS 92.018—which allows for similar innocent purchasers to recover money damages. At that early stage of the legislative process, petitioner submitted written testimony to the House Committee on Agriculture, Land Use, Natural Resources and Water advising the committee that "[t]he case behind the bill, involving the revocation of illegal lots that resulted from the fraudulent manipulation of Lane County Records, was appealed to the Oregon Court of Appeals. That's where its fate should be decided, not in a premature end run through preemptive legislation." Testimony, House Committee on Agriculture, Land Use, Natural Resources, and Water, HB 3362 A, Apr 4, 2023, 1-2 (testimony of Robert Emmons on behalf of Landwatch Lane County). Petitioner also argued that, if the legislature were to get involved, legislators should focus their efforts on intervenor-respondent's alleged use of forged documents. *Id*.

In response to those concerns, the bill was amended to allow challenges to the types of land use decisions that

---

[1] Notwithstanding the statements by individual legislators about intervenor-respondent's reliance on forged documents, it is important to state that there is no indication in the record of this case that intervenor-respondent has been found guilty of any crimes in connection with those documents, that intervenor-respondent has been found to have forged any documents, or that intervenor-respondent knowingly relied on documents that were forged.

intervenor-respondent had obtained on the ground that such decisions were based on forged documents, provided those challenges were filed on or before April 1, 2024. The staff measure summary for the amended version of the bill explained that the bill, as amended, was intended to address:

> "[A] unique situation of alleged fraud by a Eugene land use attorney * * * who allegedly forged deed details in 2011 that allowed her lot to be split into three developable lots. She sold two of the lots to allegedly innocent purchasers and retained the remaining lot. Following the discovery, Lane County rescinded all permits * * * [t]here is currently active litigation on the issue."

Staff Measure Summary of the Senate Committee on Rules, HB 3362 C, June 21, 2023, 2. At the hearing on the amended bill, Senator Prozanski explained that the amendments to allow untimely challenges to those specified land use decisions were meant to "narrow and focus on the exact scenario that we have." Tape Recording, Senate Committee on Rules, HB 3362 B, June 21, 2023, at 00:52:13 (comments of Sen Floyd Prozanski), https://olis.oregonlegislature.gov (accessed Oct 15, 2024). Senator Prozanski also explained that various stakeholders and interested parties such as Lane County, Landwatch Lane County, and the Oregon Property Owners Association all agreed on the amendments allowing challenges to the various land use decisions intervenor-respondent obtained as a result of the forged deeds and documents. *Id*. at 00:52:25. The legislature unanimously approved HB 3362 as amended.

That legislative history supports petitioner's argument that the legislature intended HB 3362(4)(1)(a) to apply to the specific situation at hand: Lane County's 2012 legal lot verifications of intervenor-respondent's three parcels that were later discovered to have been based on forged deeds and a property description card. The history, however, does not provide an answer for why the legislature referenced ORS 92.176 immediately after mentioning "a legal lot verification;" and it does not provide insight into why interested parties, including petitioner, may have supported the use of that statutory reference in the new law. The legislative history also does not clarify what legal rule the legislature

intended to communicate with that inherently nonsensical provision, leaving us unable to give it effect without rewriting it.

Having found no answers in the text, context, and legislative history of HB 3362 for the legislature's intent in allowing an untimely challenge to "a legal lot verification under ORS 92.176," we are left to resort to the maxims of statutory interpretation. *Gaines*, 346 Or at 172. A survey of the potentially applicable maxims reveals that one canon— the unintelligibility canon—directly addresses the circumstance we have here. We recognize that no Oregon court has applied or adopted the unintelligibility canon, so we briefly explain it before applying it.

The unintelligibility canon of statutory construction applies when statutory text makes no sense because it is intractably ambiguous or because two provisions are irreconcilable. Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, 134 (2012); *State ex rel Brnovich v. City of Phoenix*, 468 P3d 1200, 1208 (Ariz 2020) (canon applies when statutory text is "so incomplete or unintelligible that [a court] cannot divine its purpose and intent, or how to implement it"); *Board of Trustees of Judicial Reform Retirement System v. Attorney General of Commonwealth*, 132 SW 3d 770, 778 (Ky 2003) ("non-punitive civil, regulatory, or spending statutes are also invalid if they are so unintelligible as to be incapable of judicial interpretation"). In such circumstances, the unintelligible text is inoperative and cannot be given effect because it is meaningless. *People v. Pinkney*, 912 NW 2d 535, 549 n 65 (Mich 2018); Scalia & Garner, *Reading Law* at 134 (unintelligible statute "is invalid and unenforceable").

The canon is rooted in the principle of separation of powers: a court may not "'legislate' by supplying material and necessary missing terms not suggested, either expressly or impliedly, by the statutory [text]." *City of Phoenix*, 468 P3d at 1208; *Davenport Extreme Pools and Spas, Inc. v. Mulflur*, ___ SW 3d ___, 2024 WL 2982718 at *13 (Ky Ct App 2024) ("[W]here a statute is unintelligible, the courts cannot interpret it but instead must speculate about the legislative intent: such judicial speculation is effectively unauthorized

judicial legislation." (Internal quotations marks and citations omitted.)).

The Arizona Supreme Court (among others) has adopted the unintelligibility canon. That court applies the canon only after using "every authorized means to ascertain and give the [statute] an intelligible meaning." *City of Phoenix*, 468 P3d at 1208-09 (citing *Coggins v. Ely*, 202 P 391 (Ariz 1921)); *see also* Scalia & Garner, *Reading Law* at 135 ("The principle is that a statute is unintelligible if its original meaning remains intractably ambiguous after all the other interpretive tools are applied.") *and id.* at 189 (if courts "cannot make a valid choice between two differing interpretations, we are left with the consequence that a text means nothing in particular at all.") (internal quotation marks and citations omitted).

We think the Arizona Supreme Court's approach to the unintelligibility canon squares both with Oregon's approach to statutory interpretation, as that approach has been set forth by the Supreme Court and as it has been set forth by the legislature, and we adopt it for that reason.

Specifically, it is consistent with the judicially established framework for construing statutes because it requires the exhaustion of all other avenues of interpretation before the canon is invoked. That approach, as noted, relegates considerations of canons of statutory construction to the third and final tier. *Gaines*, 346 Or at 172 ("If the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty."). Here, we have exhaustively examined the text and the legislative history but have been unable to identify a meaning for the provision that would adequately account for the simple fact that there is no such thing as a "verification" decision under ORS 92.176. Only then did we turn to canons, which we also have exhaustively surveyed. None is more apt than the unintelligibility canon which, as noted, operates to preserve the boundaries separating the exercise of the judicial power from the exercise of the legislative power.

The Arizona Supreme Court's approach is also consistent with the Oregon legislature's view of the judicial role in construing statutes. The legislature itself has commanded that we should not rewrite its statutes: "In the construction of a statute, the office of judge is simply to ascertain and declare what is, in terms and substance, contained therein, not to insert what has been omitted, or to omit what has been inserted." ORS 174.010. That legislatively crafted prohibition addresses the same concern that underlies the judicially crafted unintelligibility canon: that a court should not cross the line that divides interpretation and construction from legislation.

In reaching the conclusion that the phrase "verification under ORS 92.176" is unintelligible and thus inoperative, we recognize that our responsibility in statutory construction—to construe laws in a way that "will give effect to all" provisions—is grounded in the respect owed to the legislature as the co-equal branch of government charged with writing and enacting the laws of Oregon. *State v. Cloutier*, 351 Or 68, 98, 261 P3d 1234 (2011) (citing ORS 174.010)). Consistent with that responsibility, we have endeavored to give effect to all provisions of HB 3362(4)(1)(a) but cannot do so without rewriting the law. Mindful of our constitutional obligation not to intrude on the legislature's constitutional role, we conclude that HB 3362's provision authorizing a challenge to a "legal lot verification under ORS 92.176" has no legal effect.

Affirmed.