No. 32　　　　　January 8, 2025　　　　　381

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

PROGRESSIVE UNIVERSAL INSURANCE CO.,
*Plaintiff-Respondent,*

*v.*

Aura VOYLES,
an individual,
*Defendant,*

*and*

Vance VOYLES,
an individual,
*Defendant-Appellant.*

Multnomah County Circuit Court
20CV04468; A176113

Thomas W. Brown, Judge.

Argued and submitted March 12, 2024.

Jesse A. Buss argued the cause for appellant. Also on the briefs was Willamette Law Group, PC.

Jonathan Henderson argued the cause for respondent. Also on the brief were Davis Rothwell Earle & Xóchihua, P.C.

Before Joyce, Presiding Judge, Lagesen, Chief, Judge, and DeVore, Senior Judge.*

DeVORE, S. J.

Affirmed.

_____
　* DeVore, S. J., *vice* Jacquot, J.

## DeVORE, S. J.

Aura and Vance Voyles are covered under a policy of uninsured and underinsured motorist (UM/UIM) insurance.[1] Vance Voyles appeals a judgment that declares that the policy with Progressive Universal Insurance Company (Progressive) provides $50,000-per-person UIM limits, rather than $100,000 UIM limits, for injuries he suffered in an auto accident. The trial court entered judgment for Progressive upon cross-motions for summary judgment. Voyles assigns a single error to the trial court's ruling and raises multiple arguments, which are primarily matters of statutory construction. We affirm.

### I.   FACTS

The facts are undisputed. On April 5, 2010, Aura Voyles submitted an on-line application for auto insurance. In the application, she appeared as the "named insured" with her husband as a "driver." She chose liability coverage with limits of $100,000 per person and $300,000 per accident, and she elected UM/UIM coverage with lesser limits of $50,000 per person and $100,000 per accident. At that level, the UM/UIM coverage for their two vehicles cost $8 for one and $10 for another. She signed the application electronically.

At the same time, Aura Voyles submitted a separate but related "Form 2702" for "Election of Lower Limits" (election form). The form described the nature of UM/UIM coverage. The form also compared the cost of the lower UM/UIM limits that she had chosen with the cost of UM/UIM limits of $100,000 per person and $300,000 per accident, which would match her liability limits. At the higher level, the UM/UIM premiums would have been, respectively, $10 and $13 on the vehicles for a six-month period. The form offered check-box choices of UM/UIM limits of $25,000/$50,000, $50,000/$100,000 or $100,000/$300,000. She chose the middle option of $50,000/$100,000, then signed and submitted the form electronically.

Effective two days later, Progressive issued a policy to Aura Voyles as named insured with Vance Voyles

---

[1] Aura Voyles was dismissed from the action. References to "Voyles" will be to Vance Voyles.

as a covered driver. The policy provided liability limits of $100,000 per person and $300,000 per accident, and UM/UIM limits of $50,000 per person and $100,000 per accident. The term "named insured" did not appear next to his name in the policy. Progressive issued identification cards attesting to the policy and noting as "Named Insured" (singular) Aura Voyles and showing her husband's name beneath her name. The policy was routinely reissued in the subsequent policy periods.

Prior to renewing the policy in early 2016, Progressive sent another election form with a cover sheet that explained, in part:

"On your application for insurance, you indicated that you wanted UM and/or UIM limits that are lower than your [Bodily Injury] limit.

"To confirm your choice, please check the box next to the coverage option that you want, and then sign, date, and return the enclosed form as soon as possible.

"If we don't receive your form, we'll add UM and/or UIM coverage to your policy at limits matching your current Bodily Injury protection limits. This may increase your premium."

Like before, the election form explained UM/UIM coverage, showed the premiums for UM/UIM coverage that would match the liability limits of $100,000 per person and $300,000 per accident ($41), and compared the premiums for lesser limits of $25,000 per person and $50,000 per accident ($17) or $50,000 per person and $100,000 per accident ($27). Again, Aura Voyles chose the middle option with lower premiums and limits of $50,000 per person and $100,000 per accident. She signed the election form on February 9, 2016, and mailed it back. Accordingly, Progressive issued a policy with intermediate UM/UIM limits, which were less than the liability limits. Again, the policy identified the named insured solely as Aura Voyles, and it listed the drivers as both Aura Voyles and Vance Voyles.[2]

In November 2016, Vance Voyles was seriously injured in a collision involving several cars and four victims.

_____

[2] The parties did not offer evidence of insurance identification cards for policy year 2016-17.

The responsible driver's auto policy paid its liability limit of $100,000 per accident to the four victims. Of that sum, Vance Voyles received the largest portion, $43,510. Progressive consented to the settlement, acknowledged its UIM coverage, and, in Voyles's words, "promptly issued payment" to him of $50,000. He contended, however, that the UIM policy limit should be $100,000 per person.

Progressive sought a declaratory judgment to determine its UIM limit. Progressive alleged that Aura Voyles had elected a lower UIM limit of $50,000 per person and that the court should declare that sum to be the extent of UIM benefits available to her husband. He counterclaimed for breach of contract, alleged damages in excess of payments received, and prayed for a judgment of $50,000 representing an alleged balance of unpaid UIM limits.[3]

Progressive and Voyles filed cross-motions for summary judgment. Progressive contended that the election of UM/UIM limits of $50,000 was effective. Voyles disagreed. The trial court granted Progressive's motion and denied Voyles's motion. The court entered a declaratory judgment that determined that his wife had effectively elected UIM limits of $50,000 and that her choice was binding on him.

On appeal, Voyles contends that the trial court erred in granting Progressive's motion and denying his motion.[4] He presents at least four arguments.[5] Primarily, he argues that a named insured must sign two documents, not just one, when making an election of UM/UIM limits less than liability limits. In addition, he argues that the election form is inadmissible because it was not delivered to the insureds along with the policy, as he believes such a form, along with the application, should be delivered under

---

[3] In particular, Voyles alleged past medical expenses of $70,000, future medical expenses of $10,000, lost wages of $38,600, and non-economic damages of $250,000.

[4] We reject Progressive's argument that Voyles failed to seek review of the denial of his cross-motion. *See Eden Gate, Inc. v. D&L Excavating & Trucking Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002) (both the granting and denial of cross-motions for summary judgment may be subject to review when assigned as error). For that matter, his motion was only a motion for partial summary judgment that sought denial of Progressive's motion and a contrary conclusion. He did not seek a determination of breach of contract and an award of $50,000 damages.

[5] Like the trial court, we have rearranged the sequence of arguments.

statute. Alternatively, he argues that his wife's election form is ineffective because, at the time she sought insurance, she was not quite yet a "named insured" who could make a valid election of lower UM/UIM coverage. And, finally, he argues that he, too, was a "named insured" on the insurance cards, that Progressive should be estopped from saying otherwise, that *he* did not make an election of lower UM/UIM limits, and that he cannot be bound by his wife's choice. We resolve each argument in turn. We will conclude with an endnote about a relatively recent and important change in public policy that this case illustrates.

## II.  ISSUES

### A.  *Election of Lower UM/UIM Limits*

Central to all issues is the mandate of ORS 742.502(2)(a) that an auto insurance policy should have the same limits for UM/UIM coverage as the limits of liability coverage unless a policyholder has duly chosen lower UM/UIM limits. In relevant part, ORS 742.502(2)(a) provides:

> "A motor vehicle bodily injury liability policy must have the same limits for uninsured motorist coverage as for bodily injury liability coverage unless a named insured in writing elects lower limits."

The matching-limits principle is the same as to under-insured motorist coverage. *See* ORS 742.502(2)(a) ("Uninsured motorist coverage \*\*\* must include underinsurance coverage[.]")

Voyles argues that Progressive failed to prove the "elements" of a valid election of lower limits under ORS 742.502 with a single form from a named insured. He argues that in the first paragraph, ORS 742.502(2)(a), the phrase, "a named insured in writing elects," refers to one document, while the second paragraph, ORS 742.502(2)(b), refers to a second document. In relevant part, ORS 742.502(2)(b) provides:

> "If a named insured elects lower limits, the named insured shall sign a statement to elect lower limits within 60 days after the time the named insured makes the election. The statement must acknowledge that a named insured was offered uninsured motorist coverage with the

limits equal to those for bodily injury liability. The statement must have a brief summary that is not part of the insurance contract and that describes what uninsured motorist coverage provides and what the underinsured coverage provides. The summary must also state the price for coverage with limits equal to the named insured's bodily injury liability limits and the price for coverage with the lower limits the named insured requested."

Separating the two paragraphs, Voyles reasons that paragraph (a) requires an "election" in which an insured "elects" lower limits "in writing," while paragraph (b) requires a separate "statement to elect lower limits within 60 days *after* the time the * * * *election*" described in paragraph (a) is made. He argues that "election" means an initial separate document. He suggests that "strict compliance" with the formalities of the statute is "required" to assure a considered decision. He urges that two documents are better than one. He relies on the plain text of the statute and offers no legislative history.

Progressive, like the trial court, reasons that the two paragraphs are talking about the same thing—that is, one statement signed within 60 days of the *decision* to elect lower limits. Progressive relies on the text in context and refers to legislative history.

Our goal, when interpreting a statute, is to discern what is "most likely" the intent of the legislature. *LandWatch Lane County v. Lane County*, 335 Or App 543, 545, 560 P3d 104 (2024) (*citing State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009) and ORS 174.020(1)(a)). We begin with a review of the statute's text and context because they are the best evidence of the legislature's intent. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). We also consider relevant legislative history or statutory development, when helpful. *Gaines*, 346 Or at 171-72. In this case, the statutory development of ORS 742.502 is helpful in determining whether the legislature intended that one or two documents are necessary to accomplish an insured's choice of UM/UIM limits.

In an early form, Oregon's statute on UM coverage merely required an insurer to offer its insured UM coverage

limits up to the amount of the policy's liability limits. *See former* ORS 743.789(2) (1975), *renumbered as* ORS 742.502 (1989)[6]; *see also White v. Safeco Insurance Co.*, 68 Or App 11, 13-15, 680 P2d 700 (1984) (statute imposes an affirmative duty on insurer to make offer). With the addition of a mandate for UIM coverage in 1981, the same-offer requirement became true for UIM coverage. *See former* ORS 743.789(2) (1981).[7]

When an insurer failed to make a proper offer, the UM/UIM limits were reformed or read under statute to match the policy's liability limits. *See, e.g., Blizzard v. State Farm Automobile Ins. Co.*, 86 Or App 56, 61, 738 P2d 983, *rev den*, 304 Or 149 (1987) (in the absence of an offer, policy reformed to comply with statute). During this time, disputes about offers and the amount of UM/UIM coverage were matters of recurrent litigation. *See, e.g., Beck v. Powell*, 113 Or App 318, 323-25, 832 P2d 1254, *rev den*, 314 Or 175 (1992) (citing cases; affirming effective offer); *Zuber v. Safeco Ins. Co.*, 96 Or App 596, 599-602, 773 P2d 800 (1989) (reading matching limits into policy).

In 1993, the legislature responded by making a change to reduce disputes over UM/UIM limits. The legislature enacted House Bill (HB) 3484, which replaced the "shall offer" proposition with the principle that UM/UIM coverage "shall have" limits equal to the policy's liability limits unless the policyholder chooses, in writing, a lower UM/UIM limit. *See* ORS 742.502(2) (1993) (Or Laws 1993, ch 709, § 11). In relevant part, HB 3484 (1993) made the following changes in the statute:

[6] *Former* ORS 743.789(2) (1975) provided:

"The insurer issuing such [UM] policy shall offer one or more options of uninsured motorist coverage larger than the amounts prescribed to meet the requirements of ORS chapter 486, up to the limits provided under the policy for motor vehicle bodily injury liability insurance."

[7] In relevant part, *former* ORS 743.789(2) (1981) provided:

"The insurer issuing such policy shall offer one or more options of uninsured motorist coverage larger than the amounts prescribed to meet the requirements of ORS 806.070 up to the limits provided under the policy for motor vehicle bodily injury liability insurance. Offers of uninsured motorist coverage larger than the amounts required by chapter 486 shall include underinsurance coverage ***[.] Underinsurance benefits shall be equal to uninsured motorist coverage benefits less the amount recovered from other automobile liability insurance policies."

"(2) **(a)   A motor vehicle bodily injury liability policy shall have the same limits for uninsured motorist coverage as for bodily injury liability coverage unless a named insured in writing elects lower limits.** \*\*\* ~~The insurer issuing such policy shall offer one or more options of uninsured motorist coverage larger than the amounts prescribed to meet the requirements of ORS 806.070 up to the limits provided under the policy for motor vehicle bodily injury liability insurance. Offers of~~ Uninsured motorist coverage larger than the amounts required by ORS 806.070 shall include underinsurance coverage[.]

**"(b)   A statement electing lower limits shall be signed and dated by a named insured at the time a named insured elects lower limits. The statement shall acknowledge that a named insured was offered uninsured motorist coverage with the limits equal to those for bodily injury liability. The statement shall contain a brief summary, which shall not be construed as part of the insurance contract, of what uninsured and underinsured motorist coverages provide and shall state the price for coverage with limits equal to the named insured's bodily injury liability limits and the price for coverage with the lower limits requested by the named insured. The statement shall remain in force until rescinded in writing by a named insured or until such time as motor vehicle bodily injury liability limits are changed. The form of statement used to comply with this paragraph shall be approved by the department."**

(Boldface and strikeout in original to indicate changes.)

The 1993 enactment established the principle of today's statute. And the enactment adopted the first part of the text on which Voyles relies now—ORS 742.502(2)(a). That is, a policy's UM/UIM limits shall equal the liability limits "unless a named insured in writing elects lower limits." When we read those new paragraphs (a) and (b) together as adopted, we can discern what the legislature intended in 1993. We notice that, in the second paragraph, "[a] statement electing lower limits shall be signed and dated by a named insured *at the time* a named insured elects lower limits." ORS 742.502(2)(b) (emphasis added). Read together,

when a policyholder "elects in writing" lower limits under the first paragraph (a), that is the same "election" that occurs under the second paragraph (b). That is because the event—an election in writing—occurs "at the [same] time" as the detailed statement. The 1993 statute demonstrates that the legislature intended paragraphs (a) and (b) to refer to the same election. Paragraph (b) was an elaboration of paragraph (a).

To underscore the point, the 1993 enactment dictated that the documentation must be accomplished on a form approved by the Department of Consumer and Business Services (DCBS). *See* ORS 742.502(2)(b) (referring to "department"); *see also* ORS 742.003(1) (forms to be approved by the Director of DCBS). A single form would govern the policyholder's single election.

In that way, legislative intent was made plain in the statute's text—the best evidence of intent. *See PGE*, 317 Or at 610-11 (principles of legislative intent inquiry). Although the 1993 enactment was not to be the last word, that enactment still reflected the meaning of the phrase "elects in writing" in ORS 742.502(2)(a) and the writing detailed in ORS 742.502(2)(b). The paragraphs were indeed talking about the same thing: one decision confirmed in one document. And so, our question now narrows: Did later legislation show a different intent to require *two* documents to make an election of lesser limits?

In 2003, the legislature enacted HB 2925, making a minor change in the first sentence in the second paragraph, ORS 742.502(2)(b). The sentence was revised to say:

> "(b)   A statement electing lower limits shall be signed and dated by a named insured ~~at~~ **within 60 days of** the time a named insured elects lower limits."

Or Laws 2003, ch 220, § 1 (HB 2925) (boldface and strike-out in original to indicate changes). The enactment simply enlarged the time in which a named insured could sign the election form. Signing could occur any day "within 60 days." The remainder of ORS 742.502(2)(b) remained unchanged.

Legislative history confirms a limited purpose for the 2003 enactment. *Gaines,* 346 Or at 171-72 (legislative

history can be considered where helpful). HB 2925 was introduced at the request of Farmers Insurance Company (Farmers). HB 2925 (2003) ("Sponsored by the Judiciary Committee at the request of Farmers Ins. Co."). Speaking to a House committee, Jack Barnes, a representative of Farmers, summarized that the bill extends the time in which a customer may sign a "waiver" of the requirement that UM/UIM limits match liability limits. He explained that the need for the bill arose because frequently a customer was not in an agent's office to sign the form when buying insurance. The bill would give the insurer 60 days in which to get the customer's signature. He said that, basically, the bill "doesn't really change anything." He added that DCBS was neutral on the proposal. Audio Recording, House Committee on Business, Labor & Consumer Affairs, HB 2925, April 7, 2003, at 00:58:42 (testimony of Jack Barnes), https://records. sos.state.or.us (accessed Dec 26, 2024).

Barnes repeated the testimony before a Senate committee. He explained that the problem for the insurance company is that the customer is not in the office, because they are on the telephone when arranging insurance. As a result, the insurer is "out of compliance" with the statute (*i.e.,* out of compliance with the statute that requires a signed writing "at the time" of the election). He reiterated that the purpose of the bill was to allow the insurer 60 days to obtain a signature for the "waiver." Audio Recording, Senate Committee on Business and Labor, HB 2925, April 28, 2003, at 00:22:44 (testimony of Jack Barnes), https://records. sos.state.or.us (accessed Dec 24, 2024). When asked what happens if there is "no signature," Barnes replied that the customer "receives the higher limits" (*i.e.,* UM/UIM limits matching the liability limits). *Id*. at 00:23:51.

Barnes was the lone witness before the legislature, and there was no opposition. For the convenience of other readers, the staff of the committees summarized that the bill "allows the insurer 60 days to obtain *the* signature of the policyholder." Oregon Bill Summary, HB 2925, House Committee on Business, Labor and Consumer Affairs, April 7, 2003; Oregon Bill Summary, HB 2925, Senate Committee on Business and Labor, April 28, 2003 (emphasis added).

There was no discussion of a need to require an insured to doubly document her decision by signing repetitive forms affirming lower UM/UIM limits. There was no mention of a need for a second form so as to provide a consumer time to reconsider her initial decision before her decision could be effective.

From that history, we determine that the two paragraphs of ORS 742.502(2)(a) and (b) remain interrelated: The first paragraph refers to the policyholder's *decision* that must be evidenced in writing; the second paragraph remains an elaboration of that requirement as to timing and content; and together they require but *one* signed document to confirm that decision.[8] We conclude that, like the earlier version of ORS 742.502, the current version requires a single, signed writing to document the policyholder's decision. The 2003 amendment was only intended to provide flexibility by adapting to modern circumstances. The amendment allowed the insurer to get a signed writing anytime "*within* 60 days," whether the signature be immediately or 60 days later. Accordingly, the trial court did not err in rejecting a double-document interpretation of ORS 742.502.

B.   *Admissibility of the Election Form*

Voyles also argues that there was no "evidentiary foundation" for consideration of the 2010 and 2016 documentation of Aura Voyles's choice of UM/UIM limits because Progressive did not prove that the insurer delivered back to her the signed form electing lower limits. Voyles relies on a section in the general provisions of Chapter 742 of the Insurance Code—a section that appears well before the provisions unique to auto insurance. In part, that statute provides:

> "[E]very contract of insurance shall be construed according to the terms and conditions of the policy. *When the contract is made pursuant to a written application therefor, if*

---

[8] That understanding is reinforced by the last sentence of ORS 742.502 (2)(b). As noted, it provides for DCBS to approve the form of an election under "this paragraph" (*i.e.,* paragraph (b)). If, as Voyles contends, the two paragraphs required two separate documents, then it would have been incongruous for the legislature to have carefully specified the terms of an agency-approved form for paragraph (b) but said nothing whatsoever about the terms of a document purportedly required by paragraph (a).

*the insurer delivers a copy of such application with the policy to the insured, thereupon such application shall become a part of the insurance policy. Any application that is not so delivered to the insured shall not be a part of the insurance policy and the insurer shall be precluded from introducing such application as evidence in any action based upon or involving the policy.* Any *oral representations* by the insured that are not included in an application shall not be a part of the insurance policy and the insurer shall be precluded from introducing *such representations* as evidence in any action based upon or involving the policy."

ORS 742.016(1) (emphases added).

Progressive dismisses Voyles's argument as a routine evidentiary matter, arguing that the election form was admissible as an ordinary business record. OEC 803(6) (hearsay exception). Progressive asserts, moreover, that Voyles never objected nor sought to strike the election forms during the summary judgment proceedings.

In fact, Voyles did challenge consideration of the election forms. Progressive misunderstands the issue. The issue is not a matter of the Oregon Evidence Code. The issue is whether ORS 742.016(1) is a legal bar to consideration of the election form required by ORS 742.502(2). Comparing statutes, we conclude that ORS 742.016(1) is not a bar, because it is inapt.

Today's ORS 742.016 grew out of a historic concern that an insured or an insurer's agent might make a mistake or misrepresent a fact in an application for insurance, leaving the policyholder with no chance to correct a misstatement, while giving an insurer grounds to deny coverage or rescind a policy. *See generally* Steven Plitt, et al., 2 *Couch on Insurance* § 18:6 (3d ed 2024) ("The purpose of such statutes is to guarantee that the insured is in possession of the entire contract[.]"); *id.* at § 18:13 ("The requirement primarily protects the insured by giving him or her the opportunity to correct material errors in the application."); *id.* at § 18:14 ("failure [to comply with such statutes] prevents the application *** from being admitted into evidence."); *id.* at § 18:7 ("An insurer which issues a policy [in violation of such statutes] waives its right to have such application considered as part

of the contract."); *see, e.g., Bunn v. Monarch Life Insurance*, 257 Or 409, 415-20, 478 P2d 363 (1970) (discussing statute as *former* ORS 736.305(1), *repealed by* Or Laws 1967, ch 359, § 704, and overruling particular cases); *see also Williams v. Pacific States Fire Ins. Co.*, 120 Or 1, 251 P 258 (1926) (enforcing principle in a context involving agent's mistake in oral application not provided to insured and noting that "'[I]f the company shall deliver a copy of such application to the assured, thereupon such application shall become a part of the insurance contract.'" (quoting Oregon Laws Title XLVI, ch 1, § 6351 (1920))).

In the classic scenario, when an insured made a material misrepresentation, such as denying being a smoker, and that false application *had* been delivered back to the insured, the application could be treated as part of the policy, such that an insurer could deny coverage and rescind the policy. *See, e.g., Ives v. INA Life Ins. Co.*, 101 Or App 429, 433, 790 P2d 1206, *rev den*, 310 Or 393 (1990) (permitting consideration of a false application of smoker, which had been delivered; directing summary judgment for insurer).

The scope of ORS 742.016(1), however, is not limited to the classic scenario involving misrepresentation and rescission. For example, it also applies to another situation in which an insurer sought to deny coverage based on an exclusion that had appeared solely in an application and not in the terms of the policy. *See, e.g., Progressive Ins. v. National American Ins. Co.*, 201 Or App 301, 307, 118 P2d 836 (2005) (rejecting consideration of application that sought to exclude a named driver, because application was not delivered to policyholder). Nevertheless, the circumstances here are not the circumstances addressed by ORS 742.016(1).

Progressive does not rely on Aura Voyles's "application" for insurance. Under the terms of ORS 742.016(1), it is specifically an "application" for insurance to which that statute applies. When it is returned to the insured, it is an "application" that becomes "part of the insurance policy," whatever legal consequence may follow. Instead, here, Progressive relies upon a separate document described with particularity in ORS 742.502(2)(b). That document is a specified statement about an election of UM/UIM limits.

According to ORS 742.502(2)(b), that statement includes a summary of coverage and comparative costs that "is *not* part of the insurance contract." (Emphasis added.)[9]

Given that ORS 742.016(1) describes one document that *can* become part of the policy (an application) and ORS 742.502(2)(b) describes another document that *cannot* become part of the policy (an election form), we conclude that an election form is not an application for insurance within the meaning of ORS 742.016(1). An application contains critical representations about the named insured, additional insureds, and the property or health of the insureds that would be the risk that the insurer may insure. An election form confirms the UM/UIM limits that an insured wishes to purchase. It is a specialized form that comes with its own procedure and precautions. It is described by statute, further specified by administrative rule, and signed within 60 days of the decision on lower UM/UIM limits.[10] In form and function, an application under ORS 742.016(1) and an election form under ORS 742.502(2) are separate documents. That distinction is reflected in the facts of this case: The application and the election form(s) *were* separate documents. Accordingly, ORS 742.016(1) is inapt. It did not bar the trial court from considering the 2010 and 2016 forms showing that Aura Voyles elected $50,000 per person limits for UM/UIM benefits.

## C.   *Aura Voyles As Named Insured*

Voyles also argues that the 2010 election form was ineffective. He stresses that ORS 742.502(2) requires that "a named insured" sign and submit a written election of lower UM/UIM limits. He argues that his wife was not "a named

---

[9] As noted, ORS 742.502(2)(b) provides for a written statement in which a named insured elects lower limits in writing. In addition:

"The statement must have a brief summary *that is not part of the insurance contract* and that describes what uninsured motorist coverage provides and what the underinsured coverage provides. The summary must also state the price for coverage with limits equal to the named insured's bodily injury liability limits and the price for coverage with the lower limits the named insured requested."

(Emphasis added.)

[10] The terms of an election form are specified in OAR 836-054-0000 and modeled in the rule's Exhibit 1, *available at* https://dfr.oregon.gov/laws-rules/Documents/OAR /div54-000_ex1-092015.pdf (accessed Dec 4, 2024).

insured" at the moment that she signed and submitted an electronic version of the election form for her first policy on April 3, 2010. He argues that she was not literally a "named insured" until the policy issued two days later on April 5, 2010. Therefore, he concludes that his wife was a mere "applicant" for insurance, not yet a named insured, and so she could not provide Progressive with an effective election.

Progressive observes that, if Voyles's view were law, no person could make a choice of lower UM/UIM limits at the time of an initial application for insurance; a new applicant would need to await issuance of an insurance policy to become an insured—who only then could seek a change to lower limits. Meanwhile, the insurer would be required, in the absence of an election from a "named insured," to issue a policy with UM/UIM limits to match liability limits. New applicants would be denied the choice of UM/UIM premiums—at least at the outset. By any account, the purpose of the 2003 amendment was to have allowed 60 days' flexibility, but, if Voyles were right, the amendment would have created an unexpected complication of unwanted higher premiums and a need for a policy change to conform to what the policyholder had really wanted.

Another view would be that the term "named insured" refers to the person who will become "a named insured" when the contemplated policy issues. In that way, "a named insured" could mean both the prospective policyholder signing an election form as well as a policyholder renewing a policy for another period. The term "named insured" is not defined by statute, but our methodology to determine an undefined term is well-established:

> "If the statute does not define the disputed term, we apply the ordinary tools of statutory construction to determine the term's intended meaning. [*DCBS v. Muliro*, 359 Or 736, 745, 380 P3d 270 (2016) (internal quotation marks omitted)]. \*\*\* We often consult dictionary definitions of the term \*\*\*. *Id.* We do not, however, interpret statutes solely on the basis of dictionary definitions; instead, we examine word usage in context to determine which among competing definitions is the one that the legislature more likely intended. *Id.* [at 746]."

*Kaser v. PERS*, 317 Or App 498, 502-03, 506 P3d 1134, *rev den*, 370 Or 214 (2022). A court will attempt to construe the language of a statute to be consistent with its purpose. *See Linn-Benton-Lincoln Ed. v. Linn-Benton-Lincoln ESD,* 163 Or App 558, 570, 989 P2d 25 (1999) (employing that maxim).

From the statute's history, we note that the earlier form of ORS 742.502(2) provided for an election by "a named insured" in a writing signed "at the time" of the election. ORS 742.502(2) (2001). In that earlier form, we deduce that the term "a named insured" was necessarily intended to refer to the person who would become a named insured at the time when a policy issued consistently with requested limits. Thereafter, in the legislative history of 2003, we have found no discussion of an intent to narrow the prior meaning of "a named insured." As noted, the sole witness at legislative hearings represented the insurer who requested the bill, and he explained that, other than adding 60 days' flexibility, the 2003 bill "doesn't really change anything." It follows that the 2003 amendment did not redefine "a named insured" so as to restrict the choice of lower limits to policyholders renewing or modifying existing policies.

We conclude, therefore, that Aura Voyles could make an effective election of lower limits, because she would be "a named insured" under the policy that would issue in 2010. She certainly *was* "a named insured" under the renewed policy in 2016. The trial court did not err in reaching the same conclusion.

### D.   *Vance Voyles as Named Insured*

Finally, Voyles argues that he was "a named insured" and that his signed election of lower limits was required in order to bind him. He points to Progressive's 2010 insurance identification card on which his name appeared below his wife's name and on which the words "named insured" (singular) appeared above her name. He assumes that each named insured must sign an election form for lesser UM/UIM limits. After briefing was complete in the trial court, Voyles added that Progressive, having issued the cards, should be estopped from denying that he is a named insured.

Those braided arguments are troubled for several reasons.[11] But we focus on the statutory reason.

Even if Voyles were a "named insured" by reason of an insurance identification card, ORS 742.502(2) does not require that he, too, must have signed a form to elect lower UM/UIM limits. In simple terms, the statute only requires that an election of lower limits be in writing and signed by "*a* named insured." ORS 742.502(2)(a) ("[U]nless *a* named insured in writing elects lower limits"); ORS 742.502(2)(b) ("If *a* named insured elects lower limits, the named insured shall sign a statement"). The indefinite article "a," according to *Webster's*, is "used as a function word before most singular nouns when the individual in question is undetermined, unidentified, or unspecified." *Webster's Third New Int'l Dictionary* 1 (unabridged ed 2002). The term "a" is like the words "any or each," and it is "used with a following restrictive modifier." *Id.* "Named insured" is such a modifier. Thus, as used in ORS 742.502, "a named insured" means any named insured.

Courts regularly observe that the legislature knows how to use different language when it intends to evoke different meanings. *See, e.g.*, *PGE*, 317 Or at 614 ("The legislature knows how to include qualifying language in a statute when it wants to do so."). A good contrast appears in a statute mandating auto liability coverage, when addressing how a specified driver may be excluded from coverage. That statute, ORS 742.450(6), provides:

> "A motor vehicle liability insurance policy *** may exclude by name from coverage required by subsection (2)(a) of this section any person other than the named insured, for any of the reasons stated in subsection (7) of

---

[11] Although insurers do provide insurance identification cards as a means of proof of insurance for purposes of auto liability coverage, *see* ORS 742.447 (Financial Responsibility Law [FRL]), Voyles does not address whether a card could suffice to make him a "named insured" contrary to the policy. He does not address how the card, a function of the FRL, is a *false* representation to him about his rights involving the election of UM/UIM coverage. Beyond those troubles, he does not address how estoppel could serve to enlarge the terms of the policy. *See, e.g.*, *ABCD…Vision v. Fireman's Fund Ins. Companies*, 304 Or 301, 306, 744 P2d 998 (1987) ("Estoppel cannot be invoked to expand insurance coverage or the scope of an insurance contract."); *Deardorff v. Farnsworth*, 268 Or App 844, 850, 343 P3d 687 (2015) (observing that estoppel may be available to defeat conditions of forfeiture but not to enlarge the scope of an insurance contract).

this section. When an insurer excludes a person as provided by this subsection, the insurer shall obtain a statement or indorsement, *signed by each of the named insureds*, that the policy will not provide any coverage required by subsection (2)(a) of this section when the motor vehicle is driven by any named excluded person."

(Emphasis added.) The contrast shows that, when the legislature provided that "a named insured" may elect lower UM/UIM limits, the legislature intended that *any* named insured may choose lower limits.

There is no dispute that Aura Voyles was "a named insured." Just above her electronic signature on the 2010 election form, she acknowledged:

"I understand and agree that this rejection of higher limits and election of lower limits shall be binding on all persons insured under the policy, and that this election shall apply to any renewal, restatement, substitute, amended, altered, modified or replacement policy with this company, unless a named insured revokes the election in writing or elects a different bodily injury liability limit."

She signed essentially the same form in a paper version in 2016. She received a policy that provided that "[t]he action of one named insured will be binding on all persons provided coverage under this policy." Because she was the policyholder, she was permitted under ORS 742.502(2) to make the decision about the limits she purchased. Her choice limited the policy's UM/UIM benefits, and that choice was binding on the benefits available to her husband.[12]

---

[12]    The U.S. District Court for the District of Oregon reached the same conclusion. *Humbert v. Liberty Mutual Fire Ins. Co.,* 220 WL 5099556, *2 (D Or, Aug 5, 2020), *adopted* 2020 WL 51100487 (Aug 28, 2020). The Ninth Circuit Court of Appeals affirmed, explaining:

"The relevant text of § 742.502 is unambiguous. The statute requires only 'a' named insured to make the election, and nothing in the statute suggests that 'a named insured' means anything but *one* named insured. Nor does anything in the statute suggest that one named insured cannot make a valid and binding election on behalf of other named insureds. Because the relevant statutory text is 'capable of having only one meaning,' we give no weight to the legislative history identified by Humbert. *Gaines,* [346 Or at 160, 173-74]. Thus, [ORS] 742.502 allowed MDU to make the Election on behalf of the other named insureds."

*Humbert v. Liberty Mut. Fire Ins. Co.*, 853 F App'x 182, 183 (9th Cir 2021). That court successfully anticipated our decision here.

E.  *Change in Public Policy*

As it happens, a change in public policy affected Voyles's UIM coverage at least as much as his wife's choice of UM/UIM limits. Our account of legislative history would be incomplete without acknowledging that change in law.

In 2015, the legislature enacted Senate Bill 411, which amended, among other statutes, ORS 742.502 and ORS 742.504. Or Laws 2015, ch 5, §§ 2-3. Prior to that change, UM/UIM benefits were calculated by subtracting the amount of the tortfeasor's liability payments from the greater amount damages proven in the UIM claim, if damages were less than UM/UIM limits, or from UM/UIM limits, if damages were larger than UM/UIM limits. *See, e.g.*, *Mid-Century Ins. Co. v. Perkins*, 344 Or 196, 213-18, 179 P3d 633 (2008) (no coverage was available where UM/UIM limits matched tortfeasor's liability limits). In essence, UM/UIM insurance paid the insured only that difference. *See id.* at 213-18.

SB 411 redefined the calculation of underinsurance benefits. Rather than subtracting the tortfeasor's liability payments, underinsurance coverage is now combined or "stacked" atop a liability recovery. *See* Or Laws 2015, ch 5, §§ 2 & 3 (replacing references to limits with references to damages in ORS 742.502 and ORS 742.504); *see also* News Release, SB 411, Oregon Legislature - House Democratic Caucus, Mar 5, 2015 ("SB 411 will allow injured motorists to add their uninsured motorist coverage on top of the at-fault driver's liability coverage[.]"); News Release, SB 411, Oregon Legislature - Senate Majority Office, Feb 24, 2015 ("SB 411 *** addresses 'stacking,' allowing injured motorists to add their uninsured motorist coverage on top of the at-fault driver's liability coverage[.]"). SB 411 became effective in 2016. Or Laws 2015, ch 5, § 7.

The change took effect with regard to Voyles's policy upon its renewal in 2016. Using the common calculus before 2016, a tortfeasor's payments of $43,510 would have been subtracted from a UIM policy limit of $50,000, resulting in UIM benefits of $6,490 to a claimant like Voyles. *See, e.g.*, *Takano v. Farmers Ins. Co.,* 184 Or App 479, 485-86, 56 P3d

491 (2002), *rev den*, 355 Or 195 (2003) (declaring calculation of UIM coverage based on liability payments received where there were multiple claimants). With an updated 2016 policy, however, Voyles recovered $50,000 in UIM benefits without any subtraction. Put another way, his UIM benefits were $43,510 more than they would have been under the original policy or the prior year's policy because the legislature made a sea change in the required calculation of UM/UIM insurance.

### III.  CONCLUSION

The trial court did not err in entering judgment for Progressive and in declaring the parties' rights under the policy limits duly chosen under ORS 742.502(2).

Affirmed.